UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**UNITED STATES OF AMERICA**

vs.  CASE NO: 8:23-CR-00298-TPB-TGW

**ALLAN OSEAS GOMEZ-ZALAYA**
_____/

## SENTENCING MEMORANDUM

**I.      Preliminary Statement**

Mr. Gomez-Zalaya is now before this court to accept responsibility for his crime. Despite his motivations for breaking the law, in addition to the arguably lesser wake than is often created in similar situations, M. Gomez Zalaya has a clear understanding of damage crimes such as these generally inflict. While this may not have been apparent initially, with time and education comes knowledge. For his misgiving, Mr. Gomez-Zalaya is here to atone for his bad actions. While the reason for his misconduct was solely based on an effort to provide for his family, it was still performed incorrectly. Mr. Gomez-Zalaya did pay for the identity of another. Where a bright line can be drawn in his case versus the masses, is that he did not perform a theft, did not incur debt under the identity he assumed, and for all intents and purposes lived a lawful life with the exception being that it was under an assumed identity. What is critical for this Honorable Court to know is that Mr. Gomez-Zalaya assumed this identity only to be able to obtain work benefits and better pay for his family, not to steal or convert the credit or wealth of another for his benefit.

Mr. Gomez-Zalaya was taken into custody by law enforcement on or about September 15, 2023, and has been detained since that time. He is currently being held in the Pinellas County Jail with an immigration hold and will undoubtedly be deported back to Honduras once

this case is resolved. Since Mr. Gomez-Zalaya's arrest he has been a model inmate. He has no criminal history prior to his acts related to this, and is a father and husband. Unique to his case is the fact that his arrest came about due to law enforcement investigating the death of Pinellas County Sheriff's deputy, Michael Hartwick. While Mr. Gomez-Zalaya has absolutely nothing to do with the death of Deputy Hartwick, he was present when the tragedy occurred. He has debriefed as to what he knew about Juan Molina-Salles, the man responsible for Deputy Hartwick's passing, offered all information he could about obtaining the fraudulent identity used, and even went so far as to agree to be deposed in the investigation of Deputy Hartwick, despite still pending in this case.

Pursuant to *United States v. Booker*, 125 S. Ct. 738, 756 (2005) and 18 U.S.C. 3553(a), Mr. Gomez-Zalaya respectfully requests that this Court consider these and other factors as it imposes a sentence that is "sufficient but not greater than necessary to comply with" the goals of sentencing as set forth in 18 U.S.C. 3553(a). Specifically, Mr. Gomez-Zalaya asks this Honorable Court to consider his lack of criminal history, the circumstances of Mr. Gomez-Zalaya' motivation for committing his crime, and his overall good character, and an incarcerative sentence of time served sentence followed by supervised release.

## II.     Legal Framework for Sentencing Analysis

Federal sentencing requires a two-step process. First, the district court must correctly calculate the sentencing guideline range. Second, they must consider the factors outlined in 18 U.S.C 3553(a) to determine a reasonable sentence as to each defendant in each case.

In *United States v. Talley*, the Eleventh Circuit enumerated the ten factors used to determine a reasonable sentence: (1) the nature and circumstances of the offense and the defendant's personal history and characteristics; (2) the need for the sentence to reflect the

seriousness of the offense, to promote respect for the law, and to provide a just punishment; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with appropriate educational training, vocational training, or medical care; (6) types of sentences available; (7) the correctly calculated sentence range under the sentencing guidelines; (8) pertinent policy statements of the United States Sentencing Commission; (9) the need to avoid unwarranted sentencing disparities; and (10) the need to provide restitution to any victim of the crime.  431 F.3d 784, 786 (11th Cir. 2005).

**III.    Analysis of 18 U.S.C. 3553(a) Factors**

   A. *Nature and Circumstances of the Offense*

Mr. Gomez-Zalaya was originally investigated related to the death of Pinellas County Sheriff's deputy, Michael Hartwick.  Deputy Hartwick was on duty at a construction site on Interstate 275 near Roosevelt Boulevard in Pinellas County when he was run over by a front-end loader driven by Juan Molina-Salles, an illegal immigrant.  While Mr. Gomez-Zalaya was not on the end loader, did not direct the end loader, or had anything at all to do with the death of Deputy Hartwick, he was present as a witness.  Because Juan Molina Salles is an illegal immigrant working under an assumed identity for Archer Western Construction, an investigation was initiated for Archer Western's employees, leading to the investigation of Mr. Gomez-Zalaya.  So, while the tragic death of Deputy Hartwick acted as a catalyst for the arrest for Mr. Gomez-Zalaya's crime, Mr. Gomez-Zalaya was unconnected to Deputy Hartwick's passing but for bearing witness to the events in some capacity.

Once investigated, Mr. Gomez-Zalaya cooperated fully in his own investigation, answered law enforcement when questioned, and was arrested without incident.  He has proffered as to where he got the identity he assumed and given information on the source to the

best of his ability.  Additionally, when asked to provide help in the investigation of Deputy Hartwick's death, he did absolutely everything asked of him.

Mr. Gomez-Zalaya's case is not the aggravated identity theft variety wherein one assumes the identity of another and then steals their credit, home, or other things of value. Rather, he purchased the identity in order to get his job at Archer Western, thereby allowing for benefits for he and his family, in addition to a greater likelihood of upward mobility. Undersigned counsel has no knowledge of Mr. Gomez-Zalaya damaging the credit or creating debt for the person whose identity he assumed.  While argument is in no way being proffered that his actions were justified, it is relevant to state the motivation behind his crime and the fact that once his illegal act of assuming the identity complete, he did not continue to recklessly damage the identity of the person he assumed.  To the contrary, he worked, saved, and conducted himself as a model citizen, but for assuming the identity of another.

  B. <u>History and Characteristics of the Defendant</u>

Mr. Gomez-Zelaya was born on August 15, 1980, in Danli, El Paraiso, Honduras. He had to quit school in sixth grade so he could work in order to provide income for his family. His father is Santos Aurelio Gomez, who is now 68 years old.  His mother is Hilda Del Carmen Zelaya, and she is currently 65 years old. They both reside in Honduras. Mr. Gomez-Zalaya's father is a farmer, and his mother is a homemaker.

Mr. Gomez-Zalaya has several siblings. His brother Elvin Ovidio Gomez Hernandez is 48 years old, and lives in Honduras working in agriculture. He has a sister named Hilda Rosival Gomez Hernandez who is 41 years old and resides in Spain.  He also has a sister named Xiomara Maritza Gomez Hernandez who is 40 years old and lives in Honduras working as a schoolteacher. His youngest sibling is Elieser Gomez-Zelaya who is 33 years old. He had another sister, Lezaida

Lissett Gomez-Zelaya, but sadly she passed away from an aneurism in 2016.

Mr. Gomez-Zalaya grew up in abject poverty by any measurable standard. As a child he lived with his family in a brick home with a thatched roof and a dirt floor. His family house had no electricity or running water. Whatever water the family used came from an adjacent property. The house itself did not have indoor plumbing or a bathroom. Instead, the entire family used a single outhouse adjacent to the home. The house also lacked a stove, and meals were cooked over firewood.

On August 14, 2000, Mr. Gomez-Zalaya married his wife Nidia Hernandez Valladares in Honduras. She is 44 years old and works in a restaurant. Mr. Gomez-Zalaya and his wife have four children together, all of whom live in Tampa. Their oldest child is Allen Smith Gomez Hernandez. He is 25 years old and is working in construction. Mr. Gomez-Zalaya's next oldest child is Sulmy Johanna Gomez Hernandez, who is 23 years old, and also employed in construction. His next child is Cynthia Melissa Gomez Hernandez, who is 20 years old. She is not currently working. Finally, his youngest child is his son Oseas Jafeth Gomez Hernandez, who is 12 years old. He lives with Mr. Gomez-Zalaya and his wife, is attending school, and still depends on Mr. Gomez-Zalaya and his wife for support. Their daughter Cynthia has special needs arising out of an accident which caused her to suffer mental health issues. Unfortunately, Mr. Gomez-Zalaya and his wife lack the financial resources to provide Cynthia with the proper counseling, and therefore she has not gotten the medical help she needs.

Mr. Gomez Zalaya emigrated to the United States in 2009 when he was 29 years old in order to find work and income to support his family. He lived in Georgia and Florida, finally settling in Tampa in 2016 where he remained until his arrest. He lived in a house with his wife, his brother Elieser, and his brother Duglas Hernandez Valladares. After moving to Tampa, he began

working for Archer West doing construction work. He worked there continuously until September 22, 2022 when a fellow worker was involved in a construction-related fatality involving a Pinellas County deputy. The ensuing investigation revealed that Mr. Gomez-Zalaya had used an alias in order to get his job and had been working under that alias ever since. He was terminated when the company discovered his subterfuge, which coincided with his arrest in this case.

 Mr. Gomez-Zalaya has almost no criminal history. The incidents that do appear on his record relate exclusively to driving crimes as a result of his inability to obtain a Florida driver's license. Specifically, he has a case out of Escambia County in which he was charged with having an incorrect license place on the vehicle he was driving and driving with no license or one that had been suspended, revoked, or canceled. His only other contact with the criminal justice system prior to this case was a charge in Orange County for driving without a valid license. Consequently, his criminal history score is zero and his criminal history category is level one. There is no indication or allegation that he has any history of antisocial behavior, mental health diagnoses that increase his risk of recidivism, and does not use intoxicating substances. His last reported use of alcohol was in 2022 and there is no indication he has ever used illegal drugs. He is, by all outward appearances and indications, a hard-working and honest individual who is a good husband to his wife, father to his children, and son to his parents.

 Mr. Gomez-Zalaya came to the United States simply to provide a better life for his wife and his children. While he undoubtedly went about it the wrong way, which he fully appreciates and understands, his motivations were entirely selfless and altruistic. He misappropriated his identification not for personal enrichment, or nefarious financial purposes, but simply to be able to work at an honest job for an honest wage. He was chasing the American dream so that his children would not have to live in a small house with no water, electricity, plumbing, or toilets, as

he had done. It was that motivation, and that motivation alone, that gave rise to the charge in this case.

*Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment*

Mr. Gomez-Zalaya was charged in the most recent superseding indictment with one count of aggravated identity theft, one count of false representation of a social security number, and one count of false claim of U.S. citizenship.  Ultimately Mr. Gomez-Zalaya pled to one count of aggravated identity theft and will receive a motion for substantial assistance for his cooperation and efforts in the case involving Deputy Hartwick.  As noted above, Mr. Gomez-Zalaya's criminal actions were not undertaken for the want to defraud individuals.  He had no desire to steal credit, incur debt, or attempt to convert property into his name.  His actions were a steppingstone, albeit an illegal one, for a better life.  Despite his initial criminal act, from that moment forward, he conducted himself in accord with the law.[1]

Generally stated, the charge of aggravated identity theft is an extremely serious matter.  If they weren't they would not land people within the walls of federal courthouses.  This case is different, even if ever so slightly considering the conduct referenced earlier and the motivation of Mr. Gomez-Zalaya.  There was no premeditation for this, nor was there a malicious intent to hurt.  Some aggravated identity cases are awful theatres of hell for the victims.  Many lose their good name, credit, and some are even investigated, accused of committing crimes.  Some lose everything.  Those that steal identities and commit these atrocities deserve everything that is coming their way.  Mr. Gomez-Zalaya is not of this ilk and his actions while working for Archer

---

[1] Of course, there is the undertone that all actions were on the basis of a fraud and that is not lost on the defendant or counsel.  Mr. Gomez-Zalaya, despite doing it under someone else's identity, did proceed to work legitimately and conducted himself as a positive member of society prior to his arrest.  His cooperative actions across the board subsequent to arrest are arguably a more telling indicator of his true character.

Western and since his arrest, indicate that he is not the same as horrible actors accused of this crime. He is a provider and a good person. He tried to do the right thing for his family, while coming from difficult circumstances. When a police officer lost his life, he risked his own safety inside the jailhouse walls to try to help. Of course, he had motivation to cooperate, however there was little conversation of potential benefit because he did not have overwhelming information to give. Nonetheless, he stayed the course and tried; indicating the true character of his being.

So, what is the sentencing answer? Respectfully, Mr. Gomez-Zalaya would ask for a time served sentenced with supervised release. He has served nearly 18 months in custody but has cooperated fully. He will be deported and an order of supervise release would effectively ensure an immediate, and easily proven penalty should Mr. Gomez-Zalaya choose to return illegally and get caught doing so. A resolution of the like offers a reasonable incarceration result, all the while providing the United States a mechanism to exact a further and more definite penalty should Mr. Gomez-Zalaya choose to re-enter the country illegally. Because Mr. Gomez-Zalaya lacks the anti-social, negative characteristics often found in Federal defendants, a time served sentenced followed by supervised release would satisfy the directives of 3553(a).

C. *To Afford Adequate Deterrence to Criminal Conduct*

There is generally no significant association between perceptions of punishment levels and actual levels … implying that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms." Gary Kleck, et al, *The Missing Link in General Deterrence Theory,* 43 Criminology 623 (2005). Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry,

*Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." *Id*.; *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity."). Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University. *See* Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999), summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries. *Id*. at 1. It examined the effects of changes to both the certainty and severity of punishment. *Id*. While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance." *Id*. at 2. The report concluded that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id*. at 1. According to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen *et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

While the aforementioned studies often compare noncustodial sentences to custodial sentences, the spirit of the findings is that a longer prison term is not effective as a deterrent for recidivism. The logic of these studies is sound. Admittedly, how applicable they are to Mr. Gomez-Zalaya is a difficult concept to reconcile. I say this because his actions do not portray a person with an overwhelming criminal intent; a lasting criminal intent if you will. What he did

was criminal in the purchase of the identity. His actions of using the identity moving forward were criminal. However, he was not *irresponsible* in his conduct in the way many are who commit the same crime. He did not take out loans, mortgages, or open new credit cards. He did not conduct himself as if he was in a financial playground without repercussion. In essence, he bootstrapped 'legal' status so that he could receive insurance, a retirement, and a greater potential for upward mobility within his company and increase in pay. He recognized that while his conditions, simply by virtue of being in the United States, were an improvement over Honduras, living as an illegal alien would not allow him to improve his lot in life under an American standard. It's contextual. He could make a better life than he had in Honduras just by being here illegally. Despite that, he recognized that he would be relatively stuck in a sort of holding position if he could not obtain legal status and thus advance in a career or financially. Certainly not a reason to commit a crime, however motivation for a bad act is relevant for punishing said act. So, it begs the question as to whether these studies are directly on point for someone like Mr. Gomez-Zalaya. Ultimately, sure, they would be, but their aim is likely more of a general deterrence focus.

    A further incarceration sentence for Mr. Gomez-Zalaya will not further deter criminal conduct. Specifically, it is highly unlikely Mr. Gomez-Zalaya will ever commit another crime again. He had no criminal history prior to this matter and in reality, his actions weren't borne of a malicious intent, rather the instinctual desire to improve his stock and provide for his family. Even then his practice of purchasing the personal identification information from the actual person is mitigating comparatively with other similarly situated defendants. As for general deterrence, Mr. Gomez-Zalaya' case is so incredibly unique in the totality of the circumstances of it that it is arguably distinguishable from just about any other instance of aggravated identity

theft or aggravated identity theft.

    D. *The Need to Protect the Public from Further Crimes of the Defendant*

Based on Mr. Gomez-Zalaya exemplary history and personal characteristics, it seems apparent that his criminal acts represent a solitary and rare occurrence in an otherwise law-abiding life. But the contention that Mr. Gomez-Zalaya poses an exceptionally low risk of recidivism is not merely based on mere intuition. Indeed, empirical evidence establishes that Mr. Gomez-Zalaya' history and characteristics obviates the § 3553 factor of specific deterrence.

Mr. Gomez-Zalaya is 44 years old with little criminal history, and none that will score in terms of criminal history points.[2] Moreover, he has no substance abuse problems, worked hard and well for Archer Western when he was employed, and is a devoted husband and father. Because of his lack of criminal history over and above license and tag related charges, employment history, lack of substance abuse issues, and lack of mental health concerns, Mr. Gomez-Zalaya poses an extremely low risk of recidivism. *See* U.S. Sent. Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 12-13 (May 2004).

Finally, Mr. Gomez-Zalaya' conduct since his crime not only pertains to his history and characteristics but also applies to his specific risk of recidivism. *See United States v. Clay*, 483 F.3d 739, 745 (11th Cir. 2007); *Pepper v. United States*, 562 U.S. 476 (2011); *Gall v. United States*, 552 U.S. 38 (2007)("Gall's self-motivated rehabilitation ... lends strong support to the conclusion that imprisonment was not necessary to deter Gall from engaging in future criminal conduct or to protect the public from his future criminal acts" )(citing §§ 3553(a)(2)(B)-(C))). Mr. Gomez-Zalaya has been a model inmate and while there is a lack of significant resources in the Pinellas County Jail, has made effort to maintain a positive mindset with an aim towards his future.

---

[2] Mr. Gomez-Zalaya has only driving issues, one of which occurred 19 years ago, the other eight years ago.

He had a choice to make when asked to cooperate on behalf of Deputy Hartwick and he chose the path that illustrates his true character and a clear first step toward rehabilitation. He chose to do the right thing.

In imposing the least sentence sufficient to account for the need to protect the public from further crimes of Mr. Gomez-Zalaya, this Court should consider the statistically low risk of recidivism presented by him. *United States v. Urbina*, slip op., 2009 WL 565485, *2-3 (E.D. Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and strong family ties). The fact that Mr. Gomez-Zalaya is a Criminal History Category I with zero criminal history points, supports his request for a variance. *See* 28 U.S.C. § 994(j) (Congress stressed "the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense."); *see also United States v. Paul*, 561 F.3d 970, 973 (9th Cir. 2009) (where defendant convicted of embezzlement and faced a guidelines sentence of 10-16 months, sentence of 15 months was unreasonably high in part because defendant was a first-time offender with no criminal record whatsoever); *United States v. Autery*, 555 F.3d 864 (9th Cir. 2009) (district court's *sua sponte* variance to probation not unreasonable in part because guidelines "did not fully account for [the defendant's] complete lack of criminal history").

Furthermore, Mr. Gomez-Zalaya' praiseworthy life further establishes that he is not likely to engage in criminal conduct in the future. Finally, Mr. Gomez-Zalaya' loss of reputation further underscores the tenet that he poses a low risk of recidivism. *See Adelson* 441 F.Supp.2d at 514 (stating that "[w]ith [the defendant's] reputation ruined by his conviction, it was extremely unlikely that she would ever involve himself in future misconduct."). In the absence of a deterrent effect, Mr. Gomez-Zalaya submits that a variance is warranted in his case.

Sentencing Mr. Gomez-Zalaya to a term of imprisonment will not impact his recidivism risk in a positive fashion. Empirical data fails to establish a relationship between the length of sentence and specific deterrence, regardless of the crime. *See* National Institute of Corrections, *Myths and Facts, Why Incarceration is Not the Best Way to Keep Communities Safe* (2016); *see also* Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame"). In sum, the best available evidence establishes that imprisonment does not reduce recidivism more than noncustodial sanctions. Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

The 2016 study by the National Institute of Corrections establishes three principles. First, incarceration has a negligible impact on crime prevention. Instead, a longer prison sentence may actually lead to a greater risk of recidivism. There is strong evidence that prison—by disrupting education and employment, reducing prospects for future employment, weakening family ties and exposing less serious offenders to older more serious offenders—leads to increased recidivism. Arguably for Mr. Gomez-Zalaya, being away from his family, home, and ability to work, would exact a negative effect rather than rehabilitative. *See The Criminogenic Effects of Imprisonment: Evidence from State Panel Data 1974-2002,* 6 Criminology & Public Policy 589 (2007). Additionally, per the 2016 study by the National Institute of Corrections, harsh penalties do not improve the long-term outcomes of the offender. *See also* Friedrich Nietzsche, *The*

*Genealogy of Morals*, essay 2, aph. 14 (1887) ("All in all, punishment hardens and renders people more insensible; it concentrates; it increases the feeling of estrangement; it strengthens the power of resistance."). Finally, community correction programs are more effective in reducing recidivism. *Id*. at 5.

IV.  **Conclusion**

For the foregoing reasons, Mr. Gomez-Zalaya respectfully submits that he be considered for a time served sentence followed by supervised release as he will most certainly be deported upon discharge of his sentence. Respectfully, Mr. Gomez-Zalaya submits that the requested sentence is sufficient but not greater than necessary to comply with the statutory directives set forth in 18 U.S.C. § 3553. He asks for this sentence below his current guideline recommendation for the factors referenced in this memorandum.

Respectfully submitted this 10th Day of April, 2025.

/S/ Jason M. Mayberry
MAYBERRY LAW FIRM
Jason M. Mayberry
FBN- 36212
Attorneys for the Defendant
402 E. 7th Ave.
Tampa, FL 33602
Ph-813-444-7435

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the foregoing has been furnished by Electronic Mail to the Office of the United States Attorney, 10th Day of April, 2025.

/S/ Jason M. Mayberry
JASON M. MAYBERRY, Esq.